IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

S.R., by and through his next §
friends M.R., N.R., and P.R., §
                              §
        Plaintiff,            §
                              §
v.                            §     CIVIL ACTION NO. H-08-3263
                              §
EL CAMPO INDEPENDENT SCHOOL   §
DISTRICT, et al.,             §
                              §
        Defendant.            §

**MEMORANDUM AND RECOMMENDATION**

Pending before the court[1] are a motion to dismiss filed by all of the defendants except Jackie Joseph ("Joseph") (Docket Entry No. 24), a second motion to dismiss filed by those same defendants (Docket Entry No. 30), and a motion to dismiss filed by Defendant Joseph (Docket Entry No. 35). The court has considered the motions, Plaintiff's responses, all other relevant filings, and the applicable law. As the first motion has been superseded by a virtually identical second motion to dismiss, it is moot. Therefore, the court **RECOMMENDS** that it be **DENIED**. For the reasons set forth below, the court **RECOMMENDS** that the other two motions be **GRANTED IN PART** and **DENIED IN PART**.

**I.  Case Background**

_____

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Docket Entry No. 25.

This is an appeal of the decision of a special education hearing officer in a Texas Education Agency ("TEA") proceeding filed under the Individuals with Disabilities Education Act ("IDEA").[2]   In addition to relief available under the IDEA, Plaintiff seeks damages pursuant to a variety of other federal and state laws: 42 U.S.C. § 1983 ("Section 1983"); the Americans with Disabilities Act ("ADA");[3] section 504 of the Rehabilitation Act ("Section 504");[4] negligence per se; assault; and intentional infliction of emotional distress ("IIED").

## A.   Factual Background

In a very lengthy and detailed complaint,[5] Plaintiff relates that he was "physically restrained, i.e., held down on the floor of his classroom by up to five adults, at least fifty-three times during the 2006-2007 school year."[6]   At the time, Plaintiff was a student at an elementary school within Defendant El Campo Independent School District ("ECISD").[7]   Plaintiff qualified for special education and related services based on the diagnoses of

---

[2]      20 U.S.C. §§ 1400-1482.

[3]      42 U.S.C. §§ 12101-12213.

[4]      29 U.S.C. § 794.

[5]      For example, Plaintiff identifies the dates on which each restraint allegedly occurred, as well as who was involved, where it occurred, and how long it lasted.   See generally Plaintiff's First Amended Complaint, Docket Entry No. 27, ¶¶ 123-475.

[6]      Id. at ¶ 124.

[7]      Id. at Introduction.

reactive detachment disorder, which is a serious emotional disturbance, and post-concussion syndrome, which resulted from a traumatic brain injury.[8] As a result of his impairments, Plaintiff experienced "heightened anxiety, overwhelming frustration, and episodes of aggression and decompensation."[9] When Plaintiff was five years old, the reactive detachment disorder first manifested as disruptive behavior, and a closed-head injury a year later exacerbated his symptoms.[10]

From kindergarten through third grade, Plaintiff attended regular classes with the assistance of a teacher's aide.[11] His grandparents, with whom Plaintiff lived, sought evaluation and treatment outside of school, including two hospitalizations and regular visits with a psychologist, a psychiatrist, and a behavioralist.[12]

At the start of Plaintiff's fourth-grade year in 2006, Plaintiff's individualized education program ("IEP")[13] called for presence in the "regular classroom for announcements and other

---

[8]    Id. at ¶ 37.

[9]    Id. at ¶ 69; see also id. at Introduction.

[10]    See id. at ¶ 71.

[11]    Id. at Introduction; ¶ 70.

[12]    See id. at ¶¶ 72-74.

[13]    An IEP is a written statement of the disabled child's present level of academic achievement, measurable annual educational goals, and special education, related services, and other accommodations to be provided to the child. 20 U.S.C. § 1414(d)(1)(A)(i).

routine morning activities, then . . . individualized instruction, followed by integration activities that included music, physical education, lunch and resource time."[14]  In connection with the IEP, a Behavior Intervention Plan ("BIP") included teaching Plaintiff to respond to frustration by "asking for help or a break."[15]  According to Plaintiff's teacher, he was achieving some success in self-regulating his behavior and remaining in the regular classroom with support for longer periods of time.[16]

When Plaintiff's regular teacher's aide resigned in October 2006, he was unable to adjust and began to regress.[17]  Soon thereafter, Plaintiff's teacher began using behavioral intervention techniques that "involved purposefully frustrating [Plaintiff] to the point that he would experience decompensation and become physically aggressive[] and thereafter require restraint."[18]

In December 2006, Defendant ECISD arranged for Cara Brown ("Brown"), an employee of Central Texas Autism Center, to perform a Functional Behavior Assessment ("FBA") of Plaintiff.[19]  Brown's formal training as a behavioral analyst consisted of a two-week

---

[14]    Plaintiff's First Amended Complaint, Docket Entry No. 27, ¶ 76.

[15]    Id.

[16]    Id. at ¶ 77.

[17]    Id. at ¶ 78.

[18]    Id. at ¶ 81.

[19]    Id. at ¶ 82.

seminar resulting in certification.[20]    Brown reviewed anecdotal
notes of Plaintiff's teachers from that fall and a single report by
Plaintiff's treating psychiatrist before observing Plaintiff at
school for two days.[21]    She did not review Plaintiff's other mental
health records or consult any of Plaintiff's treatment providers,
who uniformly warned against isolating him and encouraged giving
him an opportunity to calm himself.[22]    During one of the observation
days, the following occurred:

> [D]uring a math game of tic-tac-toe, [Plaintiff] put his
> head down and refused to write the number "49" on the
> game paper.   Rather than permit [Plaintiff] time to
> compose himself, Ms. Brown repeated the demand that
> [Plaintiff] write the number "49" on his paper until his
> decompensation escalated to physical aggression.   Then,
> Ms. Brown, with the assistance of multiple other adults,
> physically restrained [Plaintiff] on the floor for forty-
> five minutes--all the while the demand that he write the
> number "49" on his game paper was repeated to
> [Plaintiff].   Ms. Brown later advised N.R. [one of
> Plaintiff's next friends] that she intentionally provoked
> [Plaintiff's] decompensation and physical aggression to
> determine what she was "dealing with."[23]

Brown concluded that Plaintiff engaged in inappropriate
behavior as a way "to avoid demands or simply to gain attention."[24]
Based on her assessment, Brown recommended that teachers repeat a
demand when Plaintiff refused to comply immediately, occasionally

---

[20]    Id.

[21]    Id. at ¶ 83.

[22]    See id. at ¶¶ 83, 90.

[23]    Id. at ¶ 84.

[24]    Id. at ¶ 85.

tell Plaintiff "no" even if such a response was not warranted, interrupt Plaintiff, and occasionally tell Plaintiff to wait even when a delay was not necessary.[25]  Brown "mandated that [Plaintiff] . . . be subjected to forty-five of these 'intervention techniques' each day," that each demand be repeated until he complied, and that he be physically restrained upon escalation of aggression until he agreed to comply.[26]  Brown also instructed staff not to allow Plaintiff to resort to items he previously had learned to employ when trying to calm himself.[27]  She stated:

> If you are placing a demand on him and he runs to grab something[,] you would want to block him and keep the demand.  Most likely[,] he will then attack or hit you[,] and you will have to go into restraint.  I think running and latching on to something is just another topography of escape[-]motivated behavior that we don't want to reinforce.[28]

An Admission, Review, and Dismissal ("ARD") Committee[29] convened on January 18, 2007, and adopted all of Brown's recommendations.[30]  As part of the plan, Defendant ECISD removed Plaintiff from all regular-education classes.[31]  In an addendum

---

[25]    Id. at ¶ 86.

[26]    See id.

[27]    Id. at ¶ 95.

[28]    Id. at ¶ 96.

[29]    In Texas, the ARD Committee has the responsibility of preparing a student's IEP.  See Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 808 (5th Cir. 2003).

[30]    Plaintiff's First Amended Complaint, Docket Entry No. 27, ¶¶ 89-90.

[31]    See id. at ¶ 90.

prepared in response to an ARD Committee request, Brown set a goal for consecutive days without behavioral intervention, which, if met, would result in allowing Plaintiff to interact with one other student in the self-contained classroom for a brief period of time.[32] The academic part of Brown's plan was to give Plaintiff eighty percent easy work and to prompt him with "errorless teaching," which meant providing him the right answer.[33]

Plaintiff's teacher placed the prescribed types of demands ("work," "no," and "wait" demands) on Plaintiff throughout the spring 2007 semester.[34] When Plaintiff became upset and tried to calm himself, Plaintiff's teacher denied his requests for breaks and all comforting objects.[35] During the spring 2007 semester, implementation of the BIP resulted in more than forty episodes of restraint, ranging in duration from one minute to more than twenty.[36] Most of the time, the restraints were imposed by a team of two or more (up to five) school officials.[37] On one occasion, early in the semester, a twenty-minute restraint by three adults left a red mark on Plaintiff's head.[38] Sometime during the

---

[32]   See id. at ¶ 92.

[33]   Id. at ¶ 99.

[34]   See id. at ¶¶ 142-262.

[35]   See id. at ¶¶ 94-96; 215.

[36]   See id. at ¶¶ 142-262.

[37]   See id.

[38]   Id. at ¶ 182.

semester, Brown instructed school officials to restrain Plaintiff immediately at the first sign of any aggression, and they followed her directions.[39] On one day, staff physically restrained Plaintiff six times for a total of fifty minutes.[40] Over halfway through the semester, he reportedly experienced meltdowns twice a week, which reflected no improvement from the beginning of the school year.[41]

In April 2007, a consulting psychologist observed Plaintiff at home and school.[42]  He advised against the artificial trials and isolation, recommending, instead, that Plaintiff be given time to process requests.[43]  A different psychologist, who had begun treating Plaintiff that summer, attended Plaintiff's ARD Committee meeting in August 2007.[44]  She advised against teaching Plaintiff in a self-contained classroom as had been the placement during the spring semester.[45]  Despite her recommendations, the ARD Committee continued the IEP without change.[46]

---

[39]     See, e.g., id. at ¶¶ 98, 192, 195, 203.

[40]     Id. at ¶ 98.

[41]     See id. at ¶ 100.

[42]     Id. at ¶ 102.

[43]     Id.

[44]     See id. at ¶¶ 104, 108.

[45]     Id. at ¶ 108.

[46]     Id.

Because Plaintiff's guardians disagreed with the placement, the ARD Committee reconvened two weeks later.[47]  The committee considered input from yet another outside professional regarding the detrimental effect of teaching Plaintiff in a self-contained classroom at all times, but ultimately decided to continue the then-current placement because school officials reported progress in that setting during the prior school year.[48]

Plaintiff's guardians maintained their disagreement with the plan and withdrew him from the elementary school and hired an educator to teach Plaintiff at home.[49]  During the 2007-2008 school year, the home-school teacher reported, Plaintiff did not experience a meltdown or engage in any behavior that required physical restraint.[50]  At the end of the year, Plaintiff could control his behavior so as not to hit or kick aggressively for ten days at a time.[51]

During the 2008-2009 school year, Plaintiff attended school in the Louise Independent School District ("LISD").[52]  Although a different school district, LISD relied on Defendant ECISD to

---

[47]     Id. at ¶ 110.

[48]     See id.

[49]     See id. at ¶ 111.

[50]     See id. at ¶¶ 113-14.

[51]     Id. at ¶ 115.

[52]     Id. at Introduction, ¶ 116.

9

provide special education staff and services to LISD students;
thus, some members of Plaintiff's ARD Committee remained the same.[53]
Even so, the LISD ARD Committee unanimously approved a new plan to
educate Plaintiff in a regular classroom and to discontinue the BIP
employed while he was a student in Defendant ECISD.[54]  After one
semester in LISD, Plaintiff was improving socially and academically
and was participating in the school band.[55]  During that time,
Plaintiff was never restrained by the LISD faculty.[56]

**B.   Procedural Background**

     Soon after Brown prepared the December 2006 FBA, Plaintiff,
through his next friends, filed a "Level One" complaint with
Defendant Kim Chiles ("Chiles"), principal of Plaintiff's
elementary school.[57]  Upon denial, Plaintiff filed a "Level Two"
complaint with Defendant Mark Pool ("Superintendent"),
superintendent of the Defendant ECISD, which was denied on May 23,
2007.[58]  Plaintiff followed that with a "Level Three" complaint to
the board of trustees ("board") for Defendant ECISD.[59]  The board

---

[53]    Id. at ¶ 116.

[54]    See id. at ¶ 117.

[55]    Id. at ¶ 118.

[56]    Id.

[57]    Id. at ¶ 58; see also ¶ 84.

[58]    Id. at ¶ 59.

[59]    Id. at ¶ 60.

also denied Plaintiff's complaint.[60]   In January 2008, Plaintiff
filed a complaint with the TEA requesting a due process hearing and
alleging violations of the IDEA.[61]   A special education hearing
officer conducted a hearing and, on August 4, 2008, issued a final
order denying all relief Plaintiff requested.[62]

Three months later, Plaintiff filed a complaint in this court
and amended the complaint in January 2009, after all of the served
defendants[63] filed a joint motion to dismiss.[64]   In the amended
complaint, Plaintiff sued:  1) Defendant ECISD for violations of
the IDEA, Section 1983, the ADA, and Section 504;[65] 2) Defendant
Superintendent for violations of Section 1983; 3) seven individual
members of the board (collectively "the Board Defendants") for
violations of the IDEA, Section 1983, the ADA, and Section 504; 4)
Chiles and ten other employees at Plaintiff's elementary school[66]

---

[60]     Id.

[61]     Id. at ¶ 61.

[62]     Id.

[63]     Plaintiff did not serve Defendant Joseph until February 17, 2009.
See Return of Service, Docket Entry No. 34.

[64]     See Complaint, Docket Entry No. 1; Plaintiff's First Amended
Complaint, Docket Entry No. 27.

[65]     Plaintiff originally alleged breach of contract against Defendant
ECISD, but dropped that claim from his amended complaint.  Compare Complaint,
Docket Entry No. 1, with Plaintiff's First Amended Complaint, Docket Entry No.
27.

[66]     Plaintiff originally named another defendant, Mary Jackson, whom he
has since dismissed.  See Notice of Dismissal, Docket Entry No. 36.

(collectively "the Restraining Defendants") for violations of Section 1983 and for negligence per se,[67] assault,[68] and IIED.

Defendants filed a second motion to dismiss in substantially the same form after Plaintiff amended, and Defendant Joseph filed a very similar[69] motion to dismiss a month later.  The court now addresses the two later-filed motions.

## II.  Dismissal Standard

Pursuant to Rule 12(b)(6), dismissal of an action is appropriate whenever the complaint, on its face, fails to state a claim upon which relief can be granted.  When considering a motion to dismiss, the court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts.  In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007).

A complaint need not contain "detailed factual allegations," but must include sufficient facts to indicate the plausibility of the claims asserted, raising the "right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

---

[67]    Plaintiff alleged two counts of negligence per se, one against all of the Restraining Defendants and one against only five of them.  See Plaintiff's First Amended Complaint, Docket Entry No. 27, ¶¶ 597-614.

[68]    Plaintiff raised three counts of assault, all three against all Restraining Defendants.  See id. at ¶¶ 615-44.

[69]    Defendant Joseph's motion does not argue that Plaintiff failed to exhaust administrative remedies with regard to Section 1983, the ADA, and Section 504.  See generally Defendant Joseph's Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted ("Defendant Joseph's Motion to Dismiss"), Docket Entry No. 35.

(2007); see also In re Katrina Canal Breaches Litig., 495 F.3d at 205.  A plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Bell Atl. Corp., 550 U.S. at 555.  That is not to say that a plaintiff must meet any probability requirement, only that he needs to include enough factual detail "to raise a reasonable expectation that discovery will reveal evidence" in support of the allegations. Id. at 556.  "[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Id. (internal quotation marks omitted)(quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

### III.  Analysis

Defendants' combined motions to dismiss contain five arguments that were not mooted by Plaintiff's amended complaint.  Three of those arguments relate to the federal claims in the case and the other two relate to Plaintiff's state law claims.  The court turns first to the federal claims.

### A.  Federal Claims

Defendants argue that Plaintiff's claims under Section 1983, the ADA, and Section 504 should be dismissed to the extent those claims were not raised in Plaintiff's administrative due process

request.[70]  Defendants request also that the court dismiss Defendant
Superintendent and all of the defendant board members, who are sued
in their official capacities only, because they are redundant of
Plaintiff's claims against Defendant ECISD and have no independent
legal significance.   With regard to the substantive component of
the Section 1983 claim, Defendants argue that Plaintiff has not
alleged a violation of his due process right to bodily integrity.

### 1.  **Failure to Exhaust Administrative Remedies**[71]

The  IDEA  contains  a  rule-of-construction  provision  that
states:

> Nothing  in  this  chapter  shall  be  construed  to
> restrict or limit the rights, procedures, and remedies
> available  under  the  Constitution,  the  Americans  with
> Disabilities Act of 1990 [42 U.S.C.A. § 12101 et seq.]
> title V of the Rehabilitation Act of 1973 [29 U.S.C.A. §
> 791 et seq.], or other Federal laws protecting the rights
> of children with disabilities, except that before the
> filing of a civil action under such laws seeking relief
> that  is  also  available  under  this  subchapter,  the
> procedures under subsections (f) and (g) of this section
> shall  be  exhausted  to  the  same  extent  as  would  be
> required  had  the  action  been  brought  under  this
> subchapter.

20 U.S.C. § 1415(l).

---

[70]   The  mooted  arguments  from  the  first  motion  to  dismiss  include
Defendants' challenge to Plaintiff's breach of contract claim, which he abandoned
in his amended complaint.  <u>See</u> Defendants' 12(b)(6) Motion to Dismiss for Failure
to State a Claim Upon Which Relief Can be Granted ("Defendants' First Motion to
Dismiss"), Docket Entry No. 24; Plaintiff's First Amended Complaint, Docket Entry
No. 27.

[71]   Defendant Joseph does not raise this argument in her motion.  <u>See</u>
Defendant Joseph's Motion to Dismiss, Docket Entry No. 35.

Without identifying what aspects of Plaintiff's allegations were not exhausted, Defendants contend that Plaintiff cannot maintain his claims brought pursuant to Section 1983, the ADA, and Section 504 "to the extent that Plaintiffs did not exhaust their administrative remedies."[72] Defendants implore the court to limit its review to the "timely claims" raised in the underlying administrative appeal.[73]

The only legal authority[74] that Defendants cite in support of this argument is an opinion of the United States District Court for the District of South Dakota. Defendants cite to a footnote in that case for the statement, "Accordingly, the [c]ourt should base its decision on a review of the record from the administrative hearing."[75] In fact, the cited footnote states, in its entirety, "At oral hearing, counsel for both parties assured the [c]ourt that there was not 'additional evidence' to be received. Accordingly, the record is complete." Rapid City Sch. Dist. 51-4 v. Vahle, 733

---

[72]    Defendants' Second 12(b)(6) Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted ("Defendants' Second Motion to Dismiss"), Docket Entry No. 30, p. 8.

[73]    See id.

[74]    In their original motion, Defendants cite several nonbinding case opinions and provide a lengthier argument, but abandoned this approach in their second motion. Compare Defendants' First Motion to Dismiss, Docket Entry No. 24, pp. 8-10, with Defendants' Second Motion to Dismiss, Docket Entry No. 30, pp. 8-9. In his response to Defendants' first motion, Plaintiff distinguished each of the cases relied on by Defendants. See Plaintiff's Response to Defendants' 12(b)(6) Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted ("Plaintiff's First Response"), Docket Entry No. 28, pp. 20-22.

[75]    Defendants' Second Motion to Dismiss, Docket Entry No. 30, pp. 8-9 (citing Rapid City Sch. Dist. 51-4 v. Vahle, 733 F. Supp. 1364, 1366 n.2 (D. S.D. 1990)).

F. Supp. 1364, 1366 n.2 (D. S.D. 1990).  The footnote is appended to a reference to "additional evidence" in a sentence concerning the court's role in reviewing state agency decisions under the IDEA.  See id. at 1366.

Despite the incoherence of Defendants' argument, it does touch on an interesting issue:  the interpretation of the IDEA's rule-of-construction provision.  The Fifth Circuit has not written much on the provision.  In Pace v. Bogalusa City Sch. Bd., 403 F.3d 272, 297 (5th Cir. 2005), the court determined that redundant ADA and Section 504 claims should be dismissed under the doctrine of issue preclusion because they were "factually and legally indistinct" from the severed IDEA claim that had been adjudicated.  In an unpublished decision, the Fifth Circuit mentioned the provision. See Liva v. Northside Indep. Sch. Dist., 263 F.3d 164, 2001 WL 803846, at *2 (5th Cir. June 15, 2001).  There, the court ruled that the plaintiff was precluded from presenting the contentions in support of her IDEA claim that had not been raised in the state administrative proceedings.  Id.  The Fifth Circuit remarked, in a third case, that the IDEA does not provide for the federal court to act as an initial hearing body, specifically in reference to the exhaustion requirement for bringing an IDEA suit.  Papania-Jones v. Dupree, 275 Fed. App'x. 301, 302 n.1, 303 (5th Cir. 2008)(unpublished).

None of those cases help the court in this case, but that is of no moment because the provision itself exposes the error in Defendants' argument.   The statute clearly allows claims under Section 1983, the ADA, and Section 504 to be brought along with IDEA claims as long as Plaintiff has exhausted the administrative proceedings required by the IDEA as to all overlapping aspects of the claims.[76]   See 20 U.S.C. § 1415(l)(stating that the IDEA does not restrict the rights, procedures, and remedies available under the Constitution, the ADA, the Rehabilitations Act, or other federal laws except to the extent that the same relief is sought under those laws as is available under the IDEA).   By its own terms, the statute prohibits individuals from avoiding the administrative exhaustion requirement by disguising IDEA complaints as federal violations.   See id.

A number of district courts across the country have recognized as much.   See, e.g., Miller ex rel. JH v. W. Feliciana Parish Sch. Bd., 2008 WL 4291168, at *2 (M.D. La. Aug. 11, 2008)(unpublished), adopted, 2008 WL 4391616 (M.D. La. Sept. 16, 2008)("The plaintiff

---

[76]   The statute uses the term "relief," and Plaintiff argues that, because damages are not available under the IDEA, his request for damages pursuant to these other federal statutes excepts them from the statutory exhaustion requirement.  Although never addressed by the Fifth Circuit, that position is disfavored in a number of jurisdictions.  See, e.g., Charlie F. v. Bd. of Educ. of Skokie Sch. Dist. 68, 98 F.3d 989, 991 (7th Cir. 1996)("We read 'relief available' to mean relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers."); but see, e.g., R.B. ex rel. L.B. v. Bd. of Educ. of City of N.Y., 99 F. Supp.2d 411, 416-18 (S.D.N.Y. 2000).  As explained herein, this court does not rely on that distinction in making its recommendation and, therefore, declines to offer an opinion on Plaintiff's theory.

must . . . exhaust the IDEA administrative remedies before filing
claims under other laws such as Section 504 of the Rehabilitation
Act, the ADA and Section 1983, when seeking relief that is also
available under the IDEA."); Marc V. v. Ne. Indep. Sch. Dist., 455
F. Supp.2d 577, 592 (W.D. Tex. 2006)("The IDEA bars Plaintiffs from
circumventing the IDEA's administrative exhaustion requirement by
taking claims that could have been brought under the IDEA and
repackaging them as claims under some other statute."); Hornstine
v. Twp. of Moorestown, 263 F. Supp.2d 887, 900 (D. N.J. 2003)("[I]n
cases in which it appears that a plaintiff has cloaked an IDEA
claim as an ADA, Rehabilitation Act, or Section 1983 action in an
effort to avoid application of the IDEA's distinct exhaustion
requirement, courts will require that plaintiff to exhaust the
state administrative remedies mandated for IDEA claims.")

    In this case, the parties do not dispute that Plaintiff
exhausted administrative remedies on his IDEA claims.  To the
extent, then, that his claims under Section 1983, the ADA, and
Section 504 overlap those IDEA claims raised in the administrative
process, he has met the exhaustion requirement.  Because Defendants
request that the court allow only those claims raised in the
administrative record, they apparently take the position that
Plaintiff failed to raise all of his overlapping claims.  The court
declines the invitation to sort through the entire administrative
record to determine what issues present in Plaintiff's complaint

18

are missing.  At the summary judgment stage, the court once again will entertain Defendants' arguments on this point, but only if they can identify particular overlapping issues that were omitted from the state hearing.

As for Plaintiff's Section 1983, ADA, and Section 504 allegations that fall outside the coverage of the IDEA,[77] Defendants cite no legal authority (and the court finds none) that requires administrative exhaustion under the present circumstances.  Without a doubt, the IDEA requires no exhaustion for these other claims if the alleged injuries cannot be remedied through the administrative process.  See 20 U.S.C. § 1415(l); McCormick v. Waukegan Sch. Dist. No. 60, 374 F.3d 564, 568 (7th Cir. 2004)(quoting Padilla v. Sch. Dist. No. 1, 233 F.3d 1268, 1274-75 (10th Cir. 2000), in discussing the futility of exhaustion).

Plaintiff is entitled to have such claims heard in the first instance by this court as is the case with any other claim brought under one of those statutes.  In this case, Plaintiff alleges

---

[77]    The purpose of the IDEA is to protect students against inappropriate educational placements regardless of whether public school districts act with discriminatory motives.  See 20 U.S.C. 1400(d); Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 523 (2007).  Claims of discrimination under the ADA and Section 504, on the other hand, require proof that the challenged act, omission, or exclusion occurred by reason of his disability.  See 29 U.S.C. § 794(a); 42 U.S.C. § 12132.  Plaintiff's allegations of violations of the ADA and Section 504 in part concern the failure of Defendant ECISD to provide educational services him in accordance with federal law, but also accuse Defendant ECISD of discriminatory conduct.  See Plaintiff's First Amended Complaint, Docket Entry No. 27, ¶¶ 39-46, 556-86.  Plaintiff's Section 1983 claim focuses on the allegation that Defendants' use of physical restraints on Plaintiff violated his Fourteenth Amendment right to bodily integrity, which is, in no way, a challenge to his educational placement.  See id. at ¶¶ 48-53, 587-96.

injuries that are not educational in addition to those that are. His Section 1983, ADA, and Section 504 claims are based, in part, on emotional and physical harm allegedly caused by the improper use of restraints.

Defendants' argument on exhaustion is not convincing at this stage of the lawsuit, and dismissal on this basis should be denied.

### 2.  **Official Capacity**

Long ago, numerous cases on Section 1983 law made clear that an official capacity suit against an official of the state is coextensive with a suit against the official's office and is treated as a suit against the government entity itself.  See Hafer v. Melo, 502 U.S. 21, 25 (1991); Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 n.55 (1978).  When both the official in his or her official capacity and the entity of which the official is an agent are sued, dismissal of the official capacity claim is appropriate.  See Perez v. Harris County, Tex., 26 F.3d 1119, 1994 WL 286267, at *5 (5th Cir. 1994)(unpublished).

Defendants argue that Plaintiff's Section 1983 claims against the individual defendants (Defendant Superintendent, the Board Defendants, the Restraining Defendants) in their official capacities[78] should be dismissed because they are redundant of

---

[78]    Plaintiff brought suit against Defendant Superintendent in his official capacity only, against the Board Defendants in their official capacities only, and the Restraining Defendants in their official and individual capacities. See Plaintiff's First Amended Complaint, Docket Entry No. 27, Introduction. Plaintiff indicated that he was directing his Section 1983 claim toward all of the defendants in all capacities sued. Id. at ¶ 588.

Plaintiff's claims against Defendant ECISD.   Plaintiff argues that dismissal is not required and urges the court not to do so on the basis that discovery will thereby be impeded.

Plaintiff does not disagree that official capacity suits are equivalent to suits against the entity of which an officer is an agent.   Nor do they argue that any of the defendants is not an agent of Defendant ECISD.[79]   Instead, Plaintiff raises policy and discovery concerns.   Citing <u>Chase v. City of Portsmouth</u>, 428 F. Supp.2d 487, 489-90 (E.D. Va. 2006), Plaintiff adopts several points made by the district court in that opinion.   Plaintiff asserts that caselaw does not mandate the dismissal of the redundant claims and that the presence of the board members in their official capacity ensures accountability for their actions without imposing any additional burden on them.   <u>Cf.</u> <u>Chase</u>, 428 F. Supp.2d at 489-90 (making similar points).   Plaintiff's greatest concern is that he will not be able to obtain discovery necessary for the prosecution of his Section 1983 claim from the individual

---

[79]   Members of the board, superintendents, principals, teachers, teacher's aides, and other school officials are agents or employees of the school districts that they serve.   <u>See, generally,</u> Tex. Educ. Code 11.051(a)(stating that independent school districts in Texas are governed by their boards); Tex. Educ. Code 11.201 (stating that superintendents are the "chief executive officer[s]" of school districts and are employed by the board); Tex. Educ. Code 11.202(b) (stating that principals assign, evaluate, and promote personnel assigned to their campuses and recommend to superintendents discipline for those employees); Tex. Educ. Code § 21.002(a) (stating that classroom teachers and principals, among others, are employed by the school district under contract); Tex. Educ. Code § 22.051(a) (listing superintendents, principals, teachers, and teacher's aides, among others, as professional employees of school districts).

21

board members should they, in their official capacities, be
dismissed from the Section 1983 cause of action.

Although the court can appreciate Plaintiff's concerns and
agrees that caselaw does not *require* dismissal in this situation,
the court disagrees that redundancy is necessary in this case.  The
fact that all of the individual defendants, except Defendant
Superintendent, are named on other counts cuts against Plaintiff's
argument for public accountability.[80]  Even if no additional burden
is imposed on the Board Defendants or the Restraining Defendants,
their presence on the Section 1983 cause of action is absolutely
unnecessary and does not affect Plaintiff's ability to pursue the
claim against Defendant ECISD.  Cf. Kentucky v. Graham, 473 U.S.
159, 167 n.14 (1985)(noting that Monell, 436 U.S. at 690 n.55, made
it unnecessary to sue local government officials in their official
capacity because suits can be brought directly against the
government unit itself).  In fact, it makes the case more
complicated than it needs to be because Plaintiff essentially is
stating a Section 1983 claim against Defendant ECISD twenty times,
rather than just once.

---

[80]   See Plaintiff's First Amended Complaint, Docket Entry No. 27, ¶¶ 548,
557, 573, 598, 607, 616, 626, 636, 646.  In their motion to dismiss, Defendants
limited their argument for dismissal of the official capacity claims to Section
1983.  See Defendants' Second Motion to Dismiss, Docket Entry No. 30, pp. 3-4.
Therefore, the court does not even consider whether dismissal of the official
capacity allegations would be appropriate with regard to the other federal claims
against the Board Defendants and the Restraining Defendants.

Plaintiff's discovery concerns do not alter the court's opinion. Plaintiff has numerous discovery tools at his disposable to obtain the evidence he needs to prosecute this claim. For example, if he is unable to obtain the information from Defendant ECISD or the individual defendants via party discovery, he can subpoena information from the individual board members.

Plaintiff's Section 1983 claims against Defendant Superintendent, the Board Defendants, and the Restraining Defendants should be dismissed.

### 3. <u>Constitutional Claim and Qualified Immunity</u>

A plaintiff can establish a prima facie case under Section 1983[81] by alleging: (1) a violation of a federal constitutional or statutory right; and (2) that the violation was committed by an individual acting under the color of state law. <u>See</u> <u>Doe v. Rains County Indep. Sch. Dist.</u>, 66 F.3d 1402, 1406 (5th Cir. 1995). The statute creates no substantive right, but only provides remedies for deprivations of rights created under federal law. <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989).

---

[81]    The provision reads, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Government officials, sued in their individual capacities, are protected by qualified immunity from Section 1983 suits for actions performed in the exercise of discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, ___ U.S. ___, 129 S. Ct. 808, 815 (2009)(quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)); <u>see also Goodman v. Harris County</u>, 571 F.3d 388, 395 (5th Cir. 2009). By pleading qualified immunity in good faith, a movant shifts the burden to the nonmovant to rebut the movant's assertion. <u>Hathaway v. Bazany</u>, 507 F.3d 312, 319 (5th Cir. 2007). In order to overcome an assertion of qualified immunity, a plaintiff bears the burden of showing both that the officer's conduct violated a constitutional or statutory right and that the right was clearly established at the time of the violation. <u>Pearson</u>, 129 S. Ct. at 815-16, 818 (acknowledging these two prongs of qualified immunity, but receding from the requirement enunciated in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), that district courts address them in order).

Here, Plaintiff alleged that Defendants violated his Fourteenth Amendment substantive due process right to bodily integrity.[82] Defendants challenge Plaintiff's ability to maintain a Section 1983 claim at both the prima facie and qualified immunity

---

[82]    Plaintiff's First Amended Complaint, Docket Entry No. 27, ¶¶ 48-53, 587-96.

stages of analysis. Detrimental to Plaintiff's claim at both steps, Defendants contend, is his failure to allege a constitutional violation.[83] Defendants do not challenge any other element of the cause of action or of qualified immunity; therefore, the court limits its review to consideration of whether Plaintiff has alleged a substantive due process violation.

Substantive due process protection emanates from the Due Process Clause of the Fourteenth Amendment to the United States Constitution[84] and prohibits the deliberate abuse or arbitrary exercise of governmental authority. See Collins v. City of Harker Heights, Tex., 503 U.S. 115, 126, 127 n.10 (1992). The right disallows such wrongful action of government, regardless of procedures of implementation. See id. at 125 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)). It encompasses an individual's "freedom from bodily restraint" and "right to be free of state-occasioned damage to [his] bodily integrity." Doe v. Taylor Indep. Sch. Dist. (hereinafter Doe), 15 F.3d 443, 450-51 (5th Cir. 1994)(speaking in terms of protecting "bodily integrity"); Foucha v. La., 504 U.S. 71, 80 (1992)(speaking in terms of protecting against "bodily restraint").

---

[83] Defendants' Second Motion to Dismiss, Docket Entry No. 30, pp. 4, 7-8; Defendant Joseph's Motion to Dismiss, Docket Entry No. 35, pp. 3, 5-7.

[84] The Fourteenth Amendment Due Process Clause states that no state shall "deprive any person of life, liberty, or property, without due process of law."

For over fifty years, courts have used the "shocks the conscience" standard, originally articulated in _Rochin v. California_, 342 U.S. 165, 172-73 (1952), to measure whether arbitrary official behavior crosses the constitutional threshold. _County of Sacramento v. Lewis_, 523 U.S. 833, 846 (1998). While acknowledging that the standard is "no calibrated yard stick," the United States Supreme Court expressed confidence that it provides sufficient guidance. _See id._ at 847. The state official's conduct must be egregious and outrageous in order to be said to shock the contemporary conscience. _See id._ at 846. Negligently inflicted harm falls below the threshold whereas intended, unjustifiable harm undoubtedly reaches the conscience-shocking level. _Id._ at 849. Everything in between is much more difficult to assess. _See id._

Because of the constitutional right's indistinct boundaries, the Supreme Court has been cautious in concluding that wide-ranging factual scenarios state substantive due process violations. _See Collins_, 503 U.S. at 125. The goal is to be careful not to expand the concept. _See id._ By example, the Supreme Court directs lower courts "to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake" and what the accused official allegedly did to deprive the plaintiff of that right. _Id._ Before directing its attention to Plaintiff's allegations in this case, the court turns to several cases with

facts similar enough to those here to provide shadowy contours of substantive due process.

The court begins with two relatively dated Supreme Court cases with continuing vitality.  The first, Ingraham v. Wright, 430 U.S. 651 (1977), acknowledged a liberty interest related to corporal punishment in school settings.  The facts centered on the punishment practices at a junior high school in Florida.  See id. at 657.  The State of Florida authorized corporal punishment, in particular, hitting disobedient students "on the buttocks with a flat wooden paddle measuring less than two feet long, three to four inches wide, and about one-half inch thick" up to five times without leaving any apparent physical injury.  Id. at 656-57.

At the junior high school in question, two boys experienced more severe paddling episodes.  See id. at 657.  One boy, who did not respond quickly enough to his teacher's instructions, endured more than twenty licks while held over a table, resulting in a hematoma (bruise) of such severity that it required medical attention and prevented him from attending school for several days. Id.  The other boy's minor infractions led to several paddlings, twice suffering strikes on his arms, one of which deprived him of full use of his arm for a week.  Id.

27

In addressing *procedural* due process,[85] the Supreme Court recognized a historic liberty interest that encompasses freedom from bodily restraint and punishment.  See id. at 673-74 (stating that "at least where school authorities, acting under color of state law, deliberately decide to punish a child for misconduct by restraining the child and inflicting appreciable physical pain, we hold that Fourteenth Amendment liberty interests are implicated."). The Supreme Court did not further explore the boundaries of those liberty interests, noting that it had no occasion in that case "to decide whether or under what circumstances corporal punishment of a public school child may give rise to an independent federal cause of action to vindicate substantive rights under the Due Process Clause." Id. at 679 n.47.[86]

Five years later, the Supreme Court directly addressed substantive due process rights related to an entirely different set of circumstances.  See Youngberg v. Romeo, 457 U.S. 307 (1982). Youngberg explored the parameters for the application of substantive due process protections to the treatment of an involuntarily committed mentally retarded person.  See id. at 314, 316-25.  Specifically, a profoundly retarded adult, who had been

---

[85]   The Supreme Court specifically denied review of the substantive due process issues.  See Ingraham, 430 U.S. at 659 n.12.

[86]   The Fifth Circuit later held that "[c]orporal punishment is a deprivation of substantive due process when it is arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning." Woodard v. Los Fresnos Indep. Sch. Dist., 732 F.2d 1243, 1246 (5th Cir. 1984); see also Fee v. Herndon, 900 F.2d 804, 808 (5th Cir. 1990).

committed to a state facility, was injured numerous times, sometimes as a result of his own violence and sometimes as a result of the reaction of other residents to him. Id. at 310. On the order of a physician while the resident was recovering from one such injury, he was physically restrained for portions of each day. Id.

The resident's mother filed two complaints related to his care, the first alleging that the facility failed to use appropriate measures to prevent his injuries and the second alleging that the facility officials routinely restrained her son for prolonged periods and failed to provide him with appropriate treatment or programs. Id. at 310-11. As framed by the Supreme Court, the arguments facing it were that the resident had "a constitutionally protected liberty interest in safety, freedom of movement, and training within the institution and that [institution officials] infringed [those] rights by failing to provide constitutionally required conditions of confinement." Id. at 315.

The Supreme Court determined that restraint may be appropriate both as part of a safety plan and as part of a training program. Id. at 320. Drawing from the balancing methods used in prior substantive due process cases, the Supreme Court determined that the question of whether the resident's rights had been violated laid in the balance between his post-commitment liberty interests and the relevant state interests in light of financial and other

29

constraints imposed on state institutions.  See id. at 320-21, 324.

In addition to duties to provide adequate food, shelter, clothing, medical care, and safety, the state facility also had the duty to refrain from restraining residents except when and to the extent professional judgment deemed necessary to assure safety or to provide training.  Id. at 324.

The Supreme Court allowed "decisions made by the appropriate professional" a degree of deference and defined professional as someone "competent, whether by education, training or experience, to make the particular decision at issue."  Id. at 323 n.30, 324. The court indicated that longer term decisions should be made by persons with more training and education than those who are required to make instantaneous day-to-day choices.  Id. at 323 n.30.  Liability may result when the decision of a professional departs substantially from "accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." Id. at 323.

The Fifth Circuit had occasion to delve into this area in a case a few years later that involved restraints used on an elementary student.  See Jefferson v. Ysleta Indep. Sch. Dist., 817 F.2d 303 (5th Cir. 1987).  The allegations were that a second-grade teacher tied a pupil to a chair secured with a jump rope around the child's waist and legs.  Id. at 304.  The teacher kept the child

there for all but the lunch hour one day and for long periods of time the next day, denying her bathroom access.  Id.  This student was the only one subjected to such treatment, which was imposed by school policy as part of an instructional technique.  Id.

The court emphasized that the alleged purpose of the restraint was instruction, not punishment.  Id. at 305.  As a result, the court found that the teaching of Ingraham and its progeny on corporal punishment did not apply.  Id.  Instead, the court found the constitutional right to bodily integrity broad enough to encompass the facts before it, stating that "state-occasioned restraints [that] are not justified by the victim's conduct or other extenuating circumstances" are unconstitutional.  Id.  With specific reference to the plaintiffs' allegations, the court held, "A young student who is not being properly punished or disciplined has a constitutional right not to be lashed to a chair through the school day and denied, among other things, the basic liberty of access to the bathroom when needed."[87]  Id.

Building on Jefferson, the Fifth Circuit tackled allegations of sexual molestation by a teacher in Doe, 15 F.3d at 443.  The teacher, who had a history of inappropriate conduct toward female students, began seducing a freshman in early fall one year.  Id. at 447.  By the end of the semester, he was engaging the child in

---

[87]    The court not only found a constitutional violation, but also found the clearly established law prohibited the actions alleged and, therefore, refused to dismiss the action based on qualified immunity.  See Jefferson, 817 F.2d at 305-06.

kissing and heavy petting, and the behavior continued to escalate through the spring semester to the point of sexual intercourse by late March or early April.  Id.

The case highlights another type of behavior against which the constitutional right to bodily integrity protects.  The court stated, "Obviously, there is never any justification for sexually molesting a schoolchild, and[,] thus, no state interest, analogous to the punitive and disciplinary objectives attendant to corporal punishment, which might support it."  Id. at 452.

Turning to Plaintiff's allegations in the case sub judice, the essence is that the school implemented a BIP that called for intentionally provoking Plaintiff to the point of aggression that required physical restraint.  The BIP involved the use of intervention techniques, such as arbitrarily telling Plaintiff "no" when he made requests or making him wait unnecessarily, at least forty-five times a day.  If any of these manufactured trials[88] upset Plaintiff, school officials denied Plaintiff objects and techniques he used to calm himself and, ultimately, physically restrained him if he was unable to control himself and until he agreed to comply with whatever demand had been placed on him.

Plaintiff endured more than fifty occasions of physical restraint during the 2006-2007 school year; more than forty of

---

[88]    Plaintiff uses the descriptor "artificially imposed" with reference to the prescribed daily tests.  See Plaintiff's First Amended Complaint, Docket Entry No. 27, ¶ 86.

which were in spring 2007 after implementation of Brown's BIP.  He was restrained by as many as five adults for as long as forty-five minutes.   One day alone, school officials restrained him six different times for a total of fifty minutes.

Brown, the BIP designer, only had a two-week training course on behavior analysis.  She ignored the recommendations of treating psychologists and other professional providers, which were uniformly contrary to the techniques she advocated.   Brown admittedly provoked Plaintiff intentionally on at least one occasion and encouraged the quick resort to physical restraints.

The facts of this case are most similar to those in Jefferson.[89]   In Jefferson, the child was restrained without a punitive or disciplinary purpose.  See id. at 305.  The same is true in this case where physical restraints were a significant part of Plaintiff's BIP.  The BIP not only called for restraint when Plaintiff's behavior escalated to the point of physical aggression, but also required school officials to contrive tests, to be imposed even in times of appropriate conduct, that intentionally provoked Plaintiff and caused him to lose control of his behavior.

---

[89]   The court notes the differences between Plaintiff's situation and that of the child in Jefferson, but finds that they have no effect on the constitutional analysis.  In Jefferson, the teacher restrained the pupil by tying her in a chair for long periods without bathroom breaks over a two-day period. See 817 F.2d at 304.  Here, Plaintiff was restrained for shorter periods of time, but on many more occasions throughout the school semester.  He was restrained by up to five adults at a time and, at least on one occasion, was left with a noticeable red mark on his head.   Although the present complaint does not specifically state that Plaintiff was denied bathroom access, it does indicate that his teacher arbitrarily told him no or made him wait when he made requests. His teacher clearly denied him breaks to calm himself.

Moreover, school officials routinely imposed physical restraints before Plaintiff's behavior was at all dangerous, using them as prophylactic measures to short-circuit aggressive behavior. Such use of restraints is prohibited by Texas law,[90] which allows school officials to restrain a student only when serious physical harm or serious property destruction is imminent and only for as long as the threat of harm lasts.  See 19 Tex. Admin. Code § 89.1053.  In defiance of the state law, Plaintiff's BIP required the use of physical restraint until Plaintiff became compliant with the demand that had been placed on him, rather than when he no longer posed a threat.[91]

When compared to the facts of an Eastern District of Texas case discussed by the parties, the allegations here even more clearly appear to raise questions regarding the constitutionality of the Defendants' conduct.  In Doe v. S&S Consol. Indep. Sch. Dist., 149 F. Supp.2d 274, 279, 281-82 (E.D. Tex. 2001), an elementary child experienced episodes when she became out of control and began throwing things, yelling, cursing, kicking, hitting, spitting, biting, and attempting to injure herself.  When the child began to lose control, the school officials attempted to

---

[90]    The court recognizes that Texas law is not a measuring stick for whether constitutional harm occurred, but it is a useful guidepost for placing Defendants' actions in context.

[91]    Plaintiff also alleges that some of the defendants who restrained Plaintiff were not properly trained.  See Plaintiff's First Amended Complaint, Docket Entry No. 27, ¶ 608 (citing 19 Tex. Admin. Code § 89.1053(d)).

34

calm her, as opposed to provoking her, and resorted to restraining her only when she began to rage in a dangerous manner. See id. at 280, 292. The court found no constitutional harm. See id. at 304. In distinguishing Jefferson, the district court stated, "Certainly, the child's conduct here was more inviting of some type of restraint . . . ." Id. at 291. Indeed, Doe's conduct was also more inviting of some type of restraint than Plaintiff's behavior in this case.

The allegations in this case also raise the questions whether professional judgment was exercised in the development of Plaintiff's BIP. Brown, who prepared the BIP and offered advice throughout the spring semester, had no mental health training other than a two-week seminar on behavior analysis. As decisions reflected in the BIP had a long-term effect on Plaintiff, they should have been made by someone with sufficient education, training, or experience to be considered professionally competent. Cf. Youngberg, 457 U.S. at 323 n.30 (stating that longer term decisions should be made by those with more training and education than persons who must make immediate choices as part of daily interaction). Brown's recommendations differed significantly from those of Plaintiff's licensed professional treatment providers. Cf. id. at 323 (indicating that liability attaches to those decisions that depart substantially "from accepted professional judgment, practice, or standards").

35

For the above reasons, the court finds that Plaintiff's allegations are sufficient to state a constitutional claim. As stated in <u>Bell Atl. Corp.</u>, allegations that raise a reasonable expectation of the discovery of supporting evidence are sufficient to survive a motion to dismiss. <u>See</u> 550 U.S. 556. Evidence in support of Plaintiff's claims, at the very least, could raise fact questions, such as whether the restraints were justified by Plaintiff's conduct, whether they were necessary for his safety and that of others and were properly administered, and whether the appropriate professional judgment was used in the development of the BIP. All of these are relevant to whether Defendants violated Plaintiff's constitutional right to bodily integrity.

Plaintiff's Section 1983 claim against Defendant ECISD should not be dismissed.

## B.   <u>State Claims</u>

According to Defendants, Plaintiff's state law claims are barred by the election-of-remedies clause in the TTCA and by his failure to exhaust administrative remedies.

### 1.   <u>Election of Remedies</u>

A judgment rendered in favor of a governmental unit bars any action against its employees involving the same subject matter that gave rise to the adjudicated state law claims. Tex. Civ. Prac. & Rem. Code § 101.106. The section states, in part: "(e) If a suit is filed under this chapter against both a governmental unit and

36

any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." Tex. Civ. Prac. & Rem. Code § 101.106.  This election-of-remedy provision grants the employee automatic derivative immunity.  <u>Davis v. Mathis</u>, 846 S.W.2d 84, 88 (Tex. App.–Dallas 1992, no writ).

Recovery against an individual employee is barred when a suit has been filed against both the governmental unit and its employee. <u>Mission Consol. Indep. Sch. Dist. v. Garcia</u>, 253 S.W.3d 653, 657 (Tex. 2008).  "Because the decision regarding whom to sue has irrevocable consequences, a plaintiff must proceed cautiously before filing suit and carefully consider whether to seek relief from the governmental unit or from the employee individually." <u>Id.</u> The <u>Garcia</u> opinion confirmed that the bar is not limited to cases in which the claims fit within the TTCA's waiver, but include those, such as intentional torts, that are expressly excluded from the statute's scope.  <u>Id.</u> at 658; <u>see also</u> <u>Brand v. Savage</u>, 920 S.W.2d 672, 674-75 (Tex. App.–Houston [1st Dist.] 1995, no writ)(finding that Texas Civil Practice and Remedies Code § 101.106 applies to foreclose intentional torts against an employee when claims involving the same subject matter were dismissed against the municipality because the allegations did not involve the use of property or arose from intentional torts).

Defendants contend that, because Plaintiff's amended complaint sues the Restraining Defendants in both their official capacities

and their individual capacities, the state law claims should be dismissed.  However, as Plaintiff points out, Defendants misread the complaint.  Plaintiff brought the Section 1983 claim against the Restraining Defendants in their official capacities, yet specifically indicates that the state law claims are directed at them in their individual capacities only.[92]  In other words, Plaintiff *did* make an election of remedies as required by Texas law, and automatic derivative immunity does not apply.  Defendants' request for dismissal of the state law claims based on derivative immunity should be denied.

### 2.  <u>Failure to Exhaust Administrative Remedies</u>

According to the Texas Education Code, a plaintiff must exhaust the remedies afforded by a school district for resolving a complaint against a professional employee before bringing a lawsuit.  Tex. Educ. Code § 22.0514.  The term "professional employee" includes a principal, a teacher, a teacher's aide, as well as any other employee who is certified for a position and exercises discretion in performing the job.  Tex. Educ. Code § 22.051(a).

Defendants argue that the state law claims against the Restraining Defendants should be dismissed because Plaintiff failed to exhaust the district remedies for all except Defendant Chiles,

---

[92]  <u>Compare</u> Plaintiff's First Amended Complaint, Docket Entry No. 27, ¶588 <u>with</u> <u>id.</u> at ¶¶ 598, 607, 616, 626, 636, 646.

the school principal.  In a footnote, Defendants state that, although Plaintiff names the Restraining Defendants in their individual capacities, the Texas statute forbids the state law claims because Plaintiff complained of actions taken within the scope of their employment.  Plaintiff responds that he sued the Restraining Defendants in their individual capacities because the actions taken were prohibited by Defendant ECISD's policies and Texas law; that is, the Restraining Defendants lacked discretion "to assault or intentionally inflict emotional distress on [Plaintiff] as a portion of, or incident to, the duties of their positions of employment with [Defendant] ECISD."[93]

Defendants' argument has limited appeal, but fails on at least a couple of fronts.  As argued by Plaintiff, he sued the Restraining Defendants in their individual capacities and alleged unauthorized, improper actions.  Cf. Johnson v. Tims, 2005 WL 1531336, at *1 (Tex. App.–Waco 2005, pet denied)(unpublished) (suggesting that the statute does not apply to claims brought against district employees in their individual capacities regarding action taken outside the scope of employment).  That impediment aside, Defendants failed to point the court to board policies that

---

[93]     Plaintiff's Response to Defendants' Second 12(b)(6) Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted, Docket Entry No. 32, p. 25.

provide remedies for the type of injuries alleged.[94]  If no remedies exist, no exhaustion is required.  Thus, the court cannot say, as a matter of law, based on the face of the complaint, that Plaintiff failed to exhaust administrative remedies, and Defendants' motion to the contrary should be denied.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that the first motion to dismiss be **DENIED AS MOOT** and the latter two motions be **GRANTED** as to Plaintiff's Section 1983 official capacity claims and **DENIED** in all other respects.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have ten days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

---

[94]     Defendants argue that the grievance policies mentioned in the amended complaint with reference to Defendant Chiles are "broad enough to encompass Plaintiff['s] state-tort claims."  Defendants' Second Motion to Dismiss, Docket Entry No. 30, p. 12.  However, the amended complaint does not describe any grievance policies or the contents of the complaints filed with Defendant Chiles, Defendant Superintendent, and the board.  See Plaintiff's First Amended Complaint, Docket Entry No. 27, ¶¶ 58-60.  Rather, it simply states that Plaintiff filed a "Level One" complaint with Defendant Chiles, followed by a "Level Two" complaint with Defendant Superintendent, followed by a "Level Three" complaint with the board of Defendant ECISD, all of which were denied.  See id. Plaintiff later filed a complaint with the TEA requesting a due process hearing on his IDEA rights.  See id. at ¶ 61.  In the IDEA complaint, Plaintiff raised all of his complaints regarding his treatment by the Restraining Defendants.  See id. at ¶ 62.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 26th day of August, 2009.

Nancy K. Johnson
United States Magistrate Judge

41